**WILLIAM MACKIN, ESQ., P.C.** *(WM 2792)*
**105 N. BROAD STREET**
**SUITE 1**
**WOODBURY, NJ 08096**
(856) 848-2152
(856) 848-4280 Fax
Attorney For Debtor/Defendant
Julia Pashkovskaya

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**
*(Camden Vicinage)*

| | |
|---|---|
| In re: | : |
| | :     Chapter 7 |
| Joseph Ruple and Julia Ruple | : |
| (F.K.A. Julia Pashkovskaya) | :     Case No. 08-27447 GMB |
| | : |
|      Debtors | : |
| | : |
| FIA Card Services, N.A. (F.K.A. MBNA | : |
| America Bank, N.A.) | :     Adv. Pro. No. 08-02720 GMB |
| | : |
|      Plaintiff | : |
| | :     DEFENDANT'S BRIEF IN SUPPORT |
|      v | :     OF DISMISSAL UNDER F.R.BANKR.P |
| | :     7012 AND F.R.CIV.P. 12(b)(1) |
| Julia V. Pashkovskaya | : |
| | : |
|      Defendant | : |
| | : |

**PRELIMINARY STATEMENT**

Defendant Julia Ruple (f/k/a. Julia Pashkovskaya) ("Defendant") has filed a motion seeking

the entry of an order dismissing this Adversary Proceeding under F.R.Bankr.P. 7012 and F.R.Civ.P.

12(b)(1) (the "Motion"). Defendant submits this brief in support of the Motion.

## FACTUAL BACKGROUND AND PROCEDURAL POSTURE

Defendant is a joint debtor in the above captioned chapter 7 case which was filed on September 12, 2008.  On November 25, 2008 Plaintiff FIA Card Services, N.A. (f/k/a MBNA America Bank, N.A.) ("Plaintiff") filed the complaint commencing this Adversary Proceeding seeking judgment under 11 U.S.C. § 523(a)(2) that specific pre-petition debts due under Defendant's credit card account number XXXXXXX0452 (the "Account") are non-dischargeable.  The Motion challenges Plaintiff's standing and thus this Court's subject matter jurisdiction to consider Plaintiff's complaint.

Plaintiff asserts that it is "the holder of a claim against Defendant arising from" the Account. (Plaintiff's Complaint, ¶ 7). Plaintiff further asserts that between May 23, 2008 and August 4, 2008 Defendant accumulated $5,187.00 in retail charges on the Account, $4,535.00 of which were purportedly incurred during the presumption period, and that at the time these charges were incurred Defendant had a specific intent to defraud Plaintiff by accepting the benefits of the cash advance/purchases without ever intending to repay same. (Plaintiff's Complaint, ¶¶ 10 - 13). Plaintiff also alleges that as a result of Defendant's alleged fraud it has "been deprived of valuable assets." (Plaintiff's Complaint, ¶16).  Plaintiff therefore requests that the Court enter judgment holding all such charges on the Account nondischargeable under section 523(a)(2).

On December 26, 2008 Defendant filed a motion to dismiss the complaint.  The motion sought dismissal on two bases: first, Defendant sought dismissal because Plaintiff had failed to file the Statement of Corporate Ownership as required by F.R.Bankr.P. 7007.1 concomitantly with the filing of the complaint.  Second, Defendant questioned Plaintiff's standing to bring, and thus this Court's subject matter jurisdiction to hear, the Adversary Proceeding.  Defendant raised this second

issue after searching the Securities and Exchange Commission's online database of publicly filed regulatory documents and finding several recent Prospectuses filed by Plaintiff indicating that Plaintiff was party to one or more Pooling and Servicing Agreements with other parties, including tax-advantaged Qualified Special Purpose Entities and securitized Master Trust(s), pursuant to which Plaintiff had securitized and sold all of its right, title and interest in and to the receivables generated on its credit card accounts to the Master Trust(s). Those Prospectuses also indicated that as a result of these securitized transactions Plaintiff was now likely to be no more than a servicer for the Master Trust(s) with regard to these account receivables - that Plaintiff was merely collecting the money now owed, by virtue of the securitization of such debt obligations, to the Master Trust(s).

In response Plaintiff filed a Rule 7007.1 Statement of Corporate Ownership on January 22, 2009 accompanied by a certification of facts made by Plaintiff's counsel Kenneth S. Jannette, Esquire (the "Jannette Certification") upon his purported personal knowledge of certain facts (Jannette Certification, ¶ 2).  The Jannette Certification asserts that "Plaintiff is a creditor in this bankruptcy proceeding" (Jannette Certification, ¶ 4). It also asserts that the Plaintiff was the "owner of this account" on the day Plaintiff filed the Adversary complaint, that "at no time since October 15, 2008 has the Plaintiff informed the undersigned that it sold, transferred, assigned or otherwise disposed of this account." (Jannette Certification, ¶ 14).

The Court conducted a hearing on Defendant's motion on February 17, 2009 at which time Plaintiff was asked to provide further evidence as to it's claim of ownership of the Account. In response to the Court's request Plaintiff subsequently submitted the certification of Michelle D. Dumont ("Dumont"), who identified herself as a vice-president of Plaintiff (the "Dumont Certification). Dumont alleged that she was "familiar with the business records of the Plaintiff with

respect to the [Account] as they relate to the securitization of said account." (Dumont Certification, ¶ 1).

Attached to the Dumont Certification was a copy of the Second Amended and Restated Pooling and Servicing Agreement by and between Plaintiff, as servicer, BA Credit Card Funding, LLC, as Transferor, and The Bank of New York, as Trustee, dated October 20, 2006 (the "PSA"). Dumont certified this to be the agreement governing Defendant's Account.  (Dumont Certification, ¶ 3).  The PSA defines and governs the relationships between and among the Plaintiff, as Servicer, the Bank of New York, as trustee (the "Trustee"), the BA Master Credit Card Trust II (formerly known as the MBNA Master Credit Card Trust II) a Qualified Special Purpose Entity (the "Trust") and BA Credit Card Funding, LLC, as Transferor ("Funding") in connection with the securitization of credit card receivables.[1]

Dumont asserts that prior to May 10, 2006, the Account was owned by Plaintiff's predecessor, BANA USA, N.A. and that since May 10, 2006 Plaintiff has owned the Account. (Dumont Certification, ¶ 4).  According to Dumont, the Trust owned the Account Receivables from May 10, 2006 until, she asserts, those receivables were "automatically"  transferred by the Trust to Funding as a result of Defendant's bankruptcy filing. However, this transfer was subject to the Trust's right to all future recoveries allocable to the receivables. (Dumont Certification, ¶ 5).

---

[1]  The PSA is an amendment to and a restatement of a prior pooling and servicing agreement between Plaintiff (as seller and servicer), the Trustee and the Trust dated June 10, 2006 (the "Prior PSA") which itself was an amendment to the original pooling and servicing agreement between Plaintiff's predecessor in interest (MBNA Bank America, National Association), the Trustee and the Trust dated August 4, 1994 ( the "Original PSA"). See PSA at pp.1 and 22. The PSA reflects that its purpose is to substitute Funding as the Transferor in Plaintiff's place under both the Prior PSA and the Original PSA, leaving Plaintiff to only occupy the role of the Servicer under the PSA. See PSA at pp.1 and 22.

Dumont also asserts that at all relevant times Plaintiff "was and remains the Servicer of the Receivables and was obligated to collect payments on the Receivables, including by legal action in its own name". (Dumont Certification, ¶ 6).

The Court conducted a follow-up hearing on Defendant's motion on March 23, 2009. At that hearing the Court asked the parties to further brief the constitutional standing issue which had been raised by the Defendant.

## APPLICABLE LEGAL STANDARDS

**1.      Bankruptcy Courts are Courts of Limited Jurisdiction**

A bankruptcy court, like any federal court, is a court of limited jurisdiction, limited by Article III of the United States Constitution to only adjudicate actual "cases" and "controversies. *See* Pic-A-State Pa., Inc. v. Reno, 76 F.3d 1294, 1297 (3d Cir.1996); In re Spree.Com Corp., 295 B.R. 762 (Bankr. E.D. Pa., 2003). As courts of limited jurisdiction, the presumption is that jurisdiction does not exist until the contrary appears. *See* Turner v. President, Directors and Company of the Bank of North America, 4 Dall. 7, 10, 1 L.Ed. 718, 719 (1799); Fairfax Countywide Citizens Ass'n v. Fairfax County, Va., 571 F.2d 1299 (4th Cir. 1978).  The burden of establishing jurisdiction is on the party claiming it. McNutt v. General Motors Accept. Corp., 298 U.S. 178, 182-83, 56, S.Ct. 780, 80 L.Ed. 1135(1936).

**2.      Standing is a Threshold Question in Every Federal Case**

Because of the limited nature of their jurisdiction, standing is a "threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin,* 422 U.S. 490,

498 (1975). The issue of a party's standing to initiate an action in the federal court is founded upon the concern about the proper and properly limited role of the courts in a democratic society. *Warth v. Seldin* 422 U.S. at  498; *Kwan v. U.S.* 84 F. Supp. 2d 613, 617, fn. 2. A challenge to the jurisdictional predicate of a party's standing raises the issue of justiciablity and necessarily implicates the subject matter jurisdiction of a Federal Court.

If a plaintiff is without standing, the court is deprived of subject matter jurisdiction. Thus a challenge to a plaintiff's standing is a challenge to the Court's subject matter jurisdiction. Such a motion is properly brought under F.R.Civ.P. 12(b)(1). *Camden County Board of Chosen Freeholders v. Beretta USA*, 123 F.Supp. 2d 245, 256 (D.N.J. 2000); *Kwan v. U.S.* 84 F. Supp. 2d 613, 617, fn. 2 (E.D.Pa 2000)[2].

Resolving a standing challenge involves deciding whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief. More specifically, "standing" is the determination of whether a specific person is the proper party to bring a particular matter to a federal court for adjudication. *Warth v. Seldin,* 422 U.S. at 500;  *Kwan v. U.S.* 84 F. Supp. 2d at 617, fn. 2.

**3.      No Presumptive Truthfulness Attaches to a Moving Party's Allegations as to Standing**

When, as in this case, the motion creates a factual issue regarding subject matter jurisdiction (Plaintiff's lack of standing) no presumptive truthfulness attaches to the plaintiff's allegations and

---

[2] In *Duffy v. Halter*, 2001 WL 253828 p.2 (E.D.Pa March 13, 2001), the court succinctly stated:
The concept of standing is an integral part of "the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 37, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)...... A motion to dismiss for want of standing implicates the court's subject matter jurisdiction, and is therefore appropriately brought under Federal Rule of Civil Procedure 12(b)(1). *Miller v. Hygrade Food Prods. Corp.,* 89 F.Supp.2d 643, 646 (E.D.Pa.2000).

the existence of disputed material facts will not preclude the court from evaluating for itself the merits of the jurisdictional claims. *Mortensen v. First Federal Savings and Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977); *N.A.M.I. v Essex County Board of Freeholders*, 91 F.Supp. 2d 781, 783; *Kwan v. U.S.* 84 F. Supp. 2d 613, 616-17 (E.D.Pa 2000)*; Natural Resources Defense Council, Inc. v. NVF, Inc.*, 1998 WL 372299, p.7, (D.Del. June 25, 1998); *Miller v. Indiana Hospital*, 562 F. Supp. 1259, 1267 (W.D. Pa 1983).

Moreover, in considering a rule12(b)(1) motion to dismiss for lack of subject matter jurisdiction, the court may consider affidavits and other evidence beyond the facts pleaded in the complaint in order to resolve the question of subject matter jurisdiction. *Gotha v. U.S.* 115 F. 3d 176, 179 (3d. Cir 1997); *Mortensen v. First Federal Savings and Loan Ass'n,* 549 F.2d at, 891-92; *N.A.M.I. v Essex County Board of Freeholders*, 91 F.Supp. 2d at 783; *Kwan v. U.S.* 84 F. Supp. 2d at 617*; Natural Resources Defense Council, Inc. v. NVF, Inc.*, 1998 WL 372299, p.87, (D.Del. June 25, 1998); *Delaware Valley Toxics Coalition v. Kurz-Hastings, Inc.*, 813 F. Supp. 1132, 1136 (E.D.Pa 1993); *Miller v. Indiana Hospital*, 562 F. Supp. at 1267.

As stated in *Regional Employers' Assurance Leagues Voluntary Employees' Beneficiary Association Trust v. Sidney Charles Markets, Inc*, 2003 WL 220181, p.3 (E.D.PA January 29, 2003):

> Motions to dismiss for lack of standing are reviewed under Rule 12(b)(1). *Maio v. Aetna,* 221 F.3d 472, 482 & n. 7 (3d Cir.2000). Federal Rule of Civil Procedure 12(b)(1) provides that a court may dismiss a complaint for "lack of jurisdiction over the subject matter." Rule 12(b)(1) motions may attack subject matter jurisdiction on one of two grounds, either facial or factual. *Gould Elec., Inc. v. United States,* 220 F.3d 169, 178 (3d Cir.2000) (citing *Mortensen v. First Fed. Sav. & Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977)). In a facial challenge, a court may only consider, in the light most favorable to the non-moving party, the allegations of the complaint and the documents referenced therein. *Id.* at 176. In contrast, when considering a factual challenge, a court must evaluate the jurisdictional merits for itself and need not attach any presumption of truthfulness to the non-moving party's allegations. *Carpet Group Int'l v. Oriental Rug Importers Assoc.,* 227 F.3d 62, 69 (3d Cir.2000) (citing *Mortenson,* 549 F.2d at 884). Moreover, a court reviewing a factual attack may consider evidence outside the pleadings. *Id.* The burden of establishing subject matter jurisdiction lies with the non-moving party. *Id.*

Even more clear is the summary of such standards offered by the Court in *The Medical Society of New Jersey v Herr*, 191 F. Supp.2d. 574, 578 (D.N.J. 2002 ):

> In recognition of the confusion courts have faced over the standard to be applied to a motion to dismiss for lack of subject matter jurisdiction, the Third Circuit has devoted substantial discussion to distinguishing 12(b)(1) motions from other dispositive motions, particularly those made pursuant to Federal Civil Rules 12(b)(6) and 56.  In *Mortensen v. First Federal Savings & Loan Ass'n,* the court of appeals sought to clarify the issue by dividing Rule 12(b)(1) motions into two categories:  facial and factual. 549 F.2d 884, 891 (3d Cir.1977).  A facial attack on jurisdiction is directed to the sufficiency of the pleading as a basis for subject matter jurisdiction.  "In reviewing a facial attack, the court must only consider the allegations of the complaint and documents referenced therein and attached thereto in the light most favorable to the plaintiff." *Gould Electronics Inc. v. United States,* 220 F.3d 169, 176 (3d Cir.2000).  Thus, a facial challenge to jurisdiction offers to the plaintiff similar safeguards to those related to Rule 12(b)(6) and 56 motions.

> In stark distinction is the factual 12(b)(1) motion which, not surprisingly, calls into question the essential facts underlying a claim of subject matter jurisdiction.  "Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction[,] its very power to hear the case[,] ... the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Mortensen,* 549 F.2d at 891;  *see Carpet Group Int'l v. Oriental Rug Importers Ass'n Inc.,* 227 F.3d 62, 69 (3d Cir.2000).  Thus, the court may proceed in a way it cannot under Rules 12(b)(6) and 56;  moreover, no presumptive truthfulness attaches to plaintiff's allegations of jurisdictional facts. *Robinson v. Dalton,* 107 F.3d 1018, 1021 (3d Cir.1997) (citing *Mortensen,* 549 F.2d at 891).  When resolving a factual challenge, the court may consult materials outside the pleadings, and the burden of proving jurisdiction rests with the plaintiff. *Gould Electronics,* 220 F.3d at 176, 178.  In general, when a Rule 12(b)(1) motion is supported by a sworn statement of facts, the court should treat the defendant's challenge as a factual attack on jurisdiction.  *See International Ass'n of Machinists & Aerospace Workers v. Northwest Airlines,* 673 F.2d 700, 711 (3d Cir.1982).

## 4.        Burden of Proof

Plaintiff has  the burden of proof that subject matter  jurisdiction does in fact exist. *Warth v. Seldin* 422 U.S. 490, 518 (1975) (it is the responsibility of the complainant to clearly allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers); *Mortensen v. First Federal Savings and Loan Ass'n,* 549 F.2d at 891; *N.A.M.I. v Essex County Board of Freeholders*, 91 F.Supp. 2d at 783; *Kwan v. U.S.* 84 F. Supp. 2d at 617;  *Natural Resources Defense Council, Inc. v. NVF, Inc.*, 1998 WL 372299, p.7, (once jurisdiction is challenged the party asserting subject matter jurisdiction has the burden of proving its existence); *Miller v. Indiana Hospital*, 562 F. Supp. at 1267 fn.11.  The plaintiff carries

throughout the litigation the burden of showing that he is properly in court. *McNutt v. G.M.A.C. 298*

*U.S. 178 (1936); Miller v. Indiana Hospital*, 562 F. Supp. at 1267, fn.10.


## **LEGAL ARGUMENT**

In an ever growing number of recent cases involving securitized debt obligations Federal

Courts have routinely been dismissing complaints and motions after finding that the plaintiff or

movant lacked (or failed to carry their burden to prove the existence of) the constitutional standing

necessary to invoke the Court's subject matter jurisdiction.  Common fact patterns arise in such

cases: either (a)  servicers seek relief in their own name despite not owning or holding the underlying

debt obligations at issue or (b) the documents reflect that the party who owns the underlying debt

obligation is not the party in whose name relief is sought.  Such problems result from the separation

of debt ownership from the debt servicing function that is a central feature of the ubiquitous

securitization of consumer debt obligations.

Such issues recently came to prominence in In re Foreclosure Cases, 2007 WL 3232430

(N.D.Ohio October 31, 2007).  In that matter the District Court for the Northern District of Ohio

dismissed a number of consolidated state law foreclosure complaints that had been filed in the

District Court upon the plaintiffs' allegations of federal diversity jurisdiction. The plaintiff in each

case claimed to be the holder and owner of the note and mortgage, but the underlying notes and

mortgages upon which the complaints were based identified parties other than the plaintiffs as the

rightful owner of the debt obligations at issue.  The Court identified the elements that each plaintiff

is required to prove to satisfy its burden of establishing the existence of federal constitutional

standing:

A party seeking to bring a case into federal court on grounds of diversity carries the burden of establishing diversity jurisdiction. *Coyne v. American Tobacco Company*, 183 F.3d 488 (6th Cir. 1999). Further, the plaintiff "bears the burden of demonstrating standing and must plead its components with specificity." *Coyne*, 183 F. 3d at 494; *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464 (1982). The minimum constitutional requirements for standing are: proof of injury in fact, causation, and redressability. *Valley Forge*, 454 U.S. at 472. In addition, "the plaintiff must be a proper proponent, and the action a proper vehicle, to vindicate the rights asserted." *Coyne*, 183 F. 3d at 494 (quoting *Pestrak v. Ohio Elections Comm'n*, 926 F. 2d 573, 576 (6th Cir. 1991)). To satisfy the requirements of Article III of the United States Constitution, the plaintiff must show he has ***personally suffered some actual injury*** as a result of the illegal conduct of the defendant. (Emphasis added). *Coyne*, 183 F. 3d at 494; *Valley Forge*, 454 U.S. at 472.

In re Foreclosure Cases, 2007 WL 3232430, p *1 (N.D.Ohio October 31, 2007) (emphasis in original).

The Court,  noting the confusion of ownership which arises from the convoluted series of debt transfers in the securitization process, was especially critical of the plaintiffs' casual attitude in failing to plead and document with specificity the true identity of the actual holder of the underlying debt obligations at the time each complaint was filed.  The Court refused to accept the plaintiffs' sloppy pleading and lack of proof, for the sake of financial expedience, as an acceptable substitute for clearly establishing such facts and held that each plaintiff bears the burden of properly establishing constitutional standing as a pre-requisite to invoke federal court subject matter jurisdiction.  Without properly satisfying such burdens the Court, exercising its role as the gate keeper to federal jurisdiction, refused to permit any of the consolidated foreclosure matters to proceed and entered an order of dismissal:

Plaintiff's, "Judge, you just don't understand how things work," argument reveals a condescending mindset and quasi-monopolistic system where financial institutions have traditionally controlled, and still control, the foreclosure process. Typically, the homeowner who finds himself/herself in financial straits, fails to make the required mortgage payments and faces a foreclosure suit, is not interested in testing state or federal jurisdictional requirements, either *pro se* or through counsel. Their focus is either, "how do I save my home," or "if I have to give it up, I'll simply leave and find somewhere else to live."

In the meantime, the financial institutions or successors/assignees rush to foreclose, obtain a default judgment and then sit on the deed, avoiding responsibility for maintaining the property while reaping the financial benefits of interest running on a judgment. The financial institutions know the law charges the one with title (still the

homeowner) with maintaining the property.

There is no doubt every decision made by a financial institution in the foreclosure process is driven by money. And the legal work which flows from winning the financial institution's favor is highly lucrative. There is nothing improper or wrong with financial institutions or law firms making a profit — to the contrary , they should be rewarded for sound business and legal practices. However, unchallenged by underfinanced opponents, the institutions worry less about jurisdictional requirements and more about maximizing returns. Unlike the focus of financial institutions, the federal courts must act as gatekeepers, assuring that only those who meet diversity and standing requirements are allowed to pass through.

Counsel for the institutions are not without legal argument to support their position, but their arguments fall woefully short of justifying their premature filings, and utterly fail to satisfy their standing and jurisdictional burdens. The institutions seem to adopt the attitude that since they have been doing this for so long, unchallenged, this practice equates with legal compliance. Finally put to the test, their weak legal arguments compel the Court to stop them at the gate.

The Court will illustrate in simple terms its decision:

"Fluidity of the market" — "X" dollars,
"contractual arrangements between institutions and counsel" — "X" dollars,
"purchasing mortgages in bulk and securitizing" — "X" dollars,
 "rush to file, slow to record after judgment" — "X" dollars,
"the jurisdictional integrity of United States District Court" — "Priceless."


In re Foreclosure Cases, 2007 WL 3232430, p *3,  fn 3 (N.D.Ohio October 31, 2007).  *See also* In re Foreclosure Cases, 521 F.Supp. 2d 650 (S.D. Ohio 2007):

Federal courts have only the power authorized by Article III of the United States Constitution and the statutes enacted by Congress pursuant thereto. Bender v. Williamsport Area School District, 475 U.S. 534, 541, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986). As a result, a plaintiff must have constitutional standing in order for a federal court to have jurisdiction. *Id*.

Plaintiffs have the burden of establishing standing. Loren v. Blue Cross & Blue Shield of Michigan, 505 F.3d 598, 606-07 (6th Cir.2007). If they cannot do so, their claims must be dismissed for lack of subject matter jurisdiction. *Id*. (citing Central States Southeast & Southwest Areas Health and Welfare Fund v. Merck-Medco Managed Care, 433 F.3d 181, 199 (2d Cir.2005)).

 Because standing involves the federal court's subject matter jurisdiction, it can be raised *sua sponte*. *Id*. (citing Central States, 433 F.3d at 198). Further, standing is determined as of the time the complaint is filed. Cleveland Branch, NAACP v. City of Parma, Ohio, 263 F.3d 513, 524 (6th Cir.2001), *cert. denied*, 535 U.S. 971, 122 S.Ct. 1438, 152 L.Ed.2d 382 (2002). Finally, while a determination of standing is generally based upon allegations in the complaint, when standing is questioned, courts may consider evidence thereof. *See* NAACP, 263 F.3d at 523-30; Senter v. General Motors, 532 F.2d 511 (6th Cir.1976), *cert. denied*, 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976).

To satisfy Article III's standing requirements, a plaintiff must show: (1) it has suffered an injury in fact that is concrete and particularized and actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. Loren, at 606-07.

> To show standing, then, in a foreclosure action, the plaintiff must show that **it is the holder of the note and the mortgage at the time the complaint was filed**. The foreclosure plaintiff must also show, at the time the foreclosure action is filed, that the holder of the note and mortgage is harmed, usually by not having received payments on the note.

In re Foreclosure Cases, 521 F.Supp. 2d at 653 (emphasis added).

The issue of constitutional standing has also been raised in many recent cases in connection with motions filed by servicers or putative agents seeking stay relief on securitized mortgage obligations on behalf of third parties purportedly holding the right to enforce such obligations. For example, in In re Sheridan, 2009 WL 631355 (Bankr.D.Idaho March 12, 2009) the Bankruptcy Court for the District of Idaho sustained the chapter 7 trustee's objection to a stay relief motion filed by M.E.R.S. in connection with a securitized mortgage obligation when the movant failed to properly document both it's status as a "party in interest" to bring the motion under 11 U.S.C. § 362 and also failed to establish requisite constitutional standing. In that case M.E.R.S. filed a motion seeking stay relief claiming to be the "nominee" for H.S.B.C. Bank U.S.A., National Association, as Indenture Trustee of the Fieldstone Mortgage Investment Trust Series 2006-3. M.E.R.S. also claimed to be a "secured creditor" and a "claimant" to whom the debtors were indebted, at the time of filing, under a mortgage and promissory note naming M.E.R.S. as "beneficiary".

The Court first noted that the mortgage securitization process had created significant confusion as to the actual identity of the underlying debt holder in connection with many stay relief motions:

> ....changes in mortgage practices over the past several years have created a number of new issues. The one highlighted in this case is the standing of the moving creditor. Serial assignments of the mortgagee's interest(s) and the securitization of mortgages have complicated what was previously a generally straight-forward standing analysis. Though many creditors provide in their motions adequate explanation and documentation of their standing to seek relief on real estate secured debts, Trustee challenges the adequacy of the subject motion in this case.

<u>In re Sheridan</u>, 2009 WL 631355, p *1 .  The Court next considered the requirements necessary for

the proper prosecution of a stay relief motion: such motions must be brought by a  "party in interest"

under section 362(d) who can also separately demonstrate constitutional standing:

> The upshot of these several provisions of the Code, Rules, local rules and case law is this: to obtain stay relief,
> a motion must be brought by a party in interest, with standing. This means the motion must be brought by one
> who has a pecuniary interest in the case and, in connection with secured debts, by the entity that is entitled to
> payment from the debtor and to enforce security for such payment. That entity is the real party in interest. It
> must bring the motion or, if the motion is filed by a servicer or nominee or other agent with claimed authority
> to bring the motion, the motion must identify and be prosecuted in the name of the real party in interest.

<u>In re Sheridan</u>, 2009 WL 631355, p *4.  The Court concluded that M.E.R.S. was not a "party in

interest" within the contemplation of section 362(d): it was not an economic beneficiary under the

note or mortgage because it was owed no money by the debtors, it would not collect any money from

the debtors for it's own benefit, nor would it realize the value of the real property upon foreclosure.

Further, while M.E.R.S. might claim to be an agent for the securitized trust, by virtue of it's putative

status as "nominee", the note and mortgage accompanying the stay relief motion both reflected the

lender to be Fieldstone Mortgage Company, not the securitized trust on whose behalf M.E.R.S filed

the motion. The Court  also concluded that M.E.R.S. was without constitutional standing because

it was attempting to assert the rights that related solely to the actual holder of the mortgage note and

such issues did not directly and adversely affect M.E.R.S. pecuniarily.  *See* <u>Sheridan</u> at pp. *4 - *6.

Similarly, in the case of <u>In re Hayes</u>, 393 B.R. 259 (Bankr. D. Mass. 2008), the Court

sustained a chapter 13 debtor's objection to a stay relief motion brought by a mortgage servicer for

a securitized mortgage trust after concluding that the servicer had failed to establish the requisite

constitutional standing necessary to invoke the Court's subject matter jurisdiction.  In reaching its

conclusion the Court took the opportunity to reiterate that standing is an issue in every federal case

and if the moving party lacks (or fails to prove) standing, a federal court lacks subject matter

jurisdiction to consider the issues raised by the moving party:

> Standing is a "threshold question in every federal case, determining the power of the court to entertain the suit. *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Hence, "a defect in standing cannot be waived; it must be raised, either by the parties or by the court, whenever it becomes apparent." *U.S. v. AVX Corp.*, 962 F.2d 108, 116 n. 7 (1st Cir.1992). The inquiry into standing "involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth*, 422 U.S. at 498, 95 S.Ct. 2197, 45 L.Ed.2d 343. "In its constitutional dimension, standing imports justiciability: whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III." *Id.* Apart from this minimum constitutional mandate, the Supreme Court recognizes other limits "... on the class of persons who may invoke the courts' decisional remedial powers." *Id.* at 499, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343. These prudential limitations are self-imposed rules of judicial restraint: These considerations, which militate against standing, principally concern whether the litigant (1) *asserts the rights and interests of a third party and not his or her own*, (2) presents a claim arguably falling outside the zone of interests protected by the specific law invoked, or (3) advances abstract questions of wide public significance essentially amounting to generalized grievances more appropriately addressed to the representative branches. *[In re Shamus Holdings, LLC,* No. 08-1030-JNF, 2008 WL 3191315 (Bankr.D.Mass. Aug.6, 2008)], Slip op. at *6 (citing *Newcare,* 244 B.R. at 170) (emphasis in original).

In re Hayes, 393 B.R. at 266-67.  Many other recent cases make similar points and reach similar

conclusions when presented with stay relief motions, proofs of claim and/or other pleadings filed by

servicers or other parties in connection with securitized debt obligations when such parties lack or

fail to prove the existence of constitutional standing.  *See e.g.* In re Maisel, 378 B.R. 19 (Bankr. D.

Mass.2007) where the Court stated:

> Today, more and more homeowners turn to the bankruptcy system for protection when facing financial hardship or impending foreclosure. It is this Court's responsibility to ensure that these debtors receive the full protection of the Bankruptcy Code, including the benefit of an automatic stay, for as long as they are entitled to it. Unfortunately, concomitant with the increase in foreclosures is an increase in lenders who, in their rush to foreclose, haphazardly fail to comply with even the most basic legal requirements of the bankruptcy system. It is the lenders' responsibility to comply, and this Court's responsibility to ensure compliance, with both the substantive and procedural requirements of the Bankruptcy Code.

Maisel, 378 B.R. at 20 -21. *See also*, In re Parrish, 326 B.R. 708 (Bankr. N.D. Ohio 2005).

In In re Saffold, 373 B.R. 39 (Bankr. N.D. Ohio 2007) the court held that a mortgage creditor

who had previously sold its interest in debtor's note and mortgage, lacked Article III standing to file

a motion to dismiss the debtor's fourth bankruptcy case filed within 10 years since that creditor

would not suffer any injury personally if the debtor filed another bankruptcy case which included

mortgaged property, and would not be helped by favorable decision by bankruptcy court on its

motion seeking sanctions in the debtor's fourth bankruptcy case, such as in rem relief or bar against

re-filing, since the movant was now nothing more than a servicer of the previously securitized

mortgage debt obligations.

Other recent cases also make it clear that unless and until a moving party produces competent

admissible evidence to establish both its claim to be a proper party to bring the action and that the

requirements of constitutional standing have been met, the bankruptcy court lacks subject matter

jurisdiction to consider the matter asserted and the complaint or motion must be dismissed. *See* In

re Vargas, 396 B.R.511 (Bankr. C.D.Cal. 2008)(MERS failed to produce evidence, other than by a

low-level clerk, purporting to establish its status as a party in interest, failed to properly identify the

party in whose name it sought relief and failed to satisfy the elements necessary to admit purported

business records into evidence requiring dismissal of its stay relief motion); In re Hawkins, 2009 WL

901766 (Bankr. D. Nev. March 31, 2009)(MERS lacked both constitutional and prudential standing

to bring stay relief motions in its own name on behalf of purported mortgage holders); In re

Jacobson, 2009 WL 567188 (Bankr. W.D. Wash. March 6, 2009)(mortgage servicer that did not have

an interest in the mortgage note and which could not enforce te mortgage note in its own right failed

to establish the standing necessary to pursue a stay relief motion requiring dismissal of motion).

The widespread securitization of credit card receivables has created issues concerning

ownership of such debt obligations that are no less complex than those arising in the securitization

of mortgage debt obligations.  Regardless of such complexities, the legal requirements of standing

are equally applicable to actions seeking to enforce securitized credit card debt obligations in the

bankruptcy court. When the enforcement action at issue is a complaint seeking nondischargeability

of such debt obligations a putative plaintiff's allegations of standing must be strictly proven and

validated by the Court with exactitude: no debtor should be subject to the potential diminishment

of the discharge relief granted by this Court by a party that lacks constitutional standing.

Unlike motions seeking stay relief under section 362(d), the moving party must be more than

a mere "party in interest" to file an adversary complaint seeking to hold a debt obligation

nondischargeable under section 523(a)(2). Pursuant to 11 U.S.C. § 523(c)(1) only the creditor  to

whom the debt is owed is authorized to seek relief under section 523(a)(2):

> Except as provided in subsection (a)(3)(B) of this section, the debtor shall be discharged from a debt of a kind specified in paragraph (2), (4), or (6) of subsection (a) of this section, unless, ***on request of the creditor to whom such debt is owed***, and after notice and a hearing, the court determines such debt to be excepted from discharge under paragraph (2), (4), or (6), as the case may be, of subsection (a) of this section. (emphasis added).

A "creditor" is defined as an entity that has a claim against the debtor that arose at the time

of or before the order for relief concerning the debtor. 11 U.S.C. § 101(10)(A).  In turn, a "claim"

is defined as the right to payment, whether or not such right is reduced to judgment, liquidated,

unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured,

or unsecured. 11 U.S.C. § 101(5)(A).  While the Plaintiff claims to be a "creditor" in this case and

to "hold a claim" against the Defendant, by virtue of it's continued ownership of the Account, the

PSA makes clear that the Plaintiff is not a "creditor" in this case. It holds no claim against the

Defendant; it does not own the underlying debt obligations which are the subject of the complaint.

At best, Plaintiff is a servicer of the debt obligations owned by the Trust. Plaintiff therefore lacks

standing to prosecute this adversary proceeding.

All debt obligations due under the credit card accounts which have been securitized pursuant

to the provisions of the PSA, including the receivables under Defendant's Account, were sold to the Trust. *See* PSA Section 2.01 at p.20 (Conveyance of Receivables) by which the Transferor (BA Credit Card Funding LLC) sold all of its right, title and interest in the Receivables, without recourse, to the Trustee of the BA Master Credit Card Trust II.  That section also states that  "The parties hereto intend that each transfer of Receivables and other property pursuant to this agreement constitute a sale." PSA Section 2.01 at p.21, ¶ 3.[3]  Additionally,  Section 2.02 of the PSA (at p. 23) reflects the Trustee's acceptance of the transferred Receivables on behalf of the Trust.[4]

The sale of such Receivables was warranted by the Transferor as being free and clear of any lien by or through the Transferor or its affiliates. *See* PSA Section 2.04 at p 25. Further, each existing and newly created Receivable is warranted to be an "Eligible Receivable" - meaning that immediately prior to sale to the Trust, the Transferor (not the Plaintiff) had good and marketable title to each such Receivable. *See* PSA Section 2.04(iv) at p. 25 and the definition of the term "Eligible Receivable" at p.7 of the PSA.  Next,  the parties agreed that any property, assets or rights transferred under the PSA were no longer the property of the Transferor. *See* PSA Section 13.18(a) at p. 96. Finally, PSA Section 2.01 at p. 22 makes clear that the sale of the Receivables by the Transferor to the Trust constituted a true sale between separate and independent parties (the Trust is a party

---

[3]  Section 2.01 also reflects that Plaintiff  had also previously sold the Receivables on its credit card accounts to the Trust under the Prior PSA, that Funding is now substituted in for Plaintiff as the Seller and Transferor of such accounts under the Prior PSA, that the Prior PSA transactions are not negated and that Plaintiff continues in its capacity only as a servicer under the Prior PSA. *See* PSA Section 2.01 at p 22.

[4]  The term "Receivable" is defined as including any amount payable on an Account by an Obligor. *See* PSA at p.15. An "Obligor" is defined as any person obligated to make payments on receivables under an account. *See* PSA at p.19. Thus the sale of the Receivables constituted a sale of the entire  right to receive any and all payments made on any account by any obligor.

independent of the Plaintiff, the Transferor and any Certificate Holder). [5]

Consequently, Plaintiff has absolutely no ownership interest in the debt obligations which are the subject of this Adversary Proceeding. Such obligation were sold to the Trust, without recourse, by the Transferor, a separate and independent party from the Trust, who warranted good and marketable title to such obligations and who warranted them to be free from any liens. The discharge of such Receivables in bankruptcy is therefore a discharge of debt owned by the Trust, not the Plaintiff.

Despite the foregoing Plaintiff supports its claim of standing to file the Adversary complaint in its own name on three (3) bases: (1) Plaintiff owns the "Account"; (2) Plaintiff is the Servicer charged under the PSA with collecting the Receivables; (3) the PSA authorizes Plaintiff to undertake collection activity on the Receivables in it's own name.

---

[5] Since the Receivables are generated on the accounts which Plaintiff claims to still own, the PSA leaves an open question: how did Funding obtain good and marketable title to the Receivables from the Plaintiff to permit Funding to sell them to the Trust under the PSA. The answer may be obliquely deduced from several references in the PSA to a "Receivables Purchase Agreement." That Agreement is defined on p. 15 of the PSA as "the Receivables Purchase Agreement dated as of October 20, 2006 by and between BACCS and Funding, and acknowledged and accepted by The Bank of New York, as Trustee, and FIA, as Servicer, as amended, supplemented or otherwise modified from time to time." All indications in the PSA are that the Receivables Purchase Agreement is the contract pursuant to which BACCS transferred and continues to transfer all of BACCS' right, title and interest in and to the Receivables generated on the Plaintiff's credit card accounts to Funding and that, under the PSA, Funding subsequently sells all such ownership rights in and to the Receivables to the Trust . *See e.g.* PSA Section 9.01(d) at p.69, which makes BACCS' inability to transfer the Receivables to Transferor (Funding) under the Receivables Purchase Agreement a "payout event". Pursuant to the operative terms of the PSA, the Transferor (Funding) has sold all of the right, title and interest in and to the Receivables which it acquired under the Receivables Purchase Agreement to the Trust. *See* PSA Section 2.01, at pp. 20-21. Assuming this to be correct, Plaintiff is removed even further from the ownership of the Receivables: the Trust now owns them, having acquired them from the Transferor (Funding). Funding acquired them from BACCS. How and from whom BACCS acquired ownership of the Receivables is unclear. We may assume that BACCS acquired them from Plaintiff. If so, then since their origination under the Plaintiff's credit card accounts, the Receivables have been sold three times to three separate parties and it is difficult to imagine precisely what claim of ownership Plaintiff can make as to these Receivables. Plaintiff has not produced the Receivables Purchase Agreement, even though it would seem to be highly relevant for the proper documentation in support of it's assertions to some continued ownership of a debt obligation or claim against the Defendant in this proceeding.

Plaintiff's continued ownership of the "Account" does not create in it a right to payment of the charges made on that Account. Such charges are owned by and owed to the Trust, not Plaintiff. Plaintiff's only connection to the Receivables is that of a Servicer under the PSA. *See* PSA at p. 16 (Definition of "Servicer") and PSA Section 3.01 (a) at p. 38.[6]  It is charged with the duty of collecting the Receivables and remitting them to the Trust. *See* PSA Section 3.01 (b) at p. 38. Plaintiff continued to own the Account solely adjust the terms of repayment under the Account (such as the annual APR or the minimum periodic amounts due) *See* Dumont Certification, ¶ 7. Thus, while the Receivables may have been originated on the Account, the owner and holder of such claims, by way of true sale,  is the Trust and Plaintiff's continued ownership of the Account for the expedience of it's Servicing duties does not vest in it the ownership of the debt obligations at issue in the complaint.

Nor is Plaintiff authorized by the PSA, in connection with its Servicing function, to bring legal action "in its own name" as asserted in the Dumont Certification.  Instead after the delinquency on a Receivable, the PSA merely authorizes Plaintiff to "commence enforcement proceedings with respect to such Receivables."  *See* PSA Section 3.10(b)(iv) at p. 38. That authority is further restricted by the requirement that any such proceedings be undertaken "to the extent permitted under and in compliance with law and regulations." *Id*.  This is hardly a grant of authority permitting Plaintiff a right of unilateral action in its own name.

One final issue is raised in Dumont's Certification as to the identity of the owner of the Receivables.  Dumont claims that the Receivables were "automatically"  transferred from the Trust

_____

[6] *See also* PSA Section 1.02(c) at p. 19 which makes clear Plaintiff's representations and warranties in the PSA are made solely in its capacity as a Servicer under the PSA.

to Funding as a result of Defendant's bankruptcy filing.  However, such specific terms are absent from the PSA  Instead, PSA Section 4.03(d) at p. 50 indicates that the Trustee is deemed to transfer to the Transferor (Funding), without recourse, all Receivables on a "Defaulted Account." A "Defaulted Account" is defined to mean only the receivables that have been charged off as uncollectible under the Credit Card Guidelines and the Servicer's customary and usual procedures for servicing accounts. *See* PSA at  p.6. Further,  the "Credit Card Guidelines" are defined to mean the Account owner's policies and procedures for extension of credit and maintenance and collection of credit card accounts. *See* PSA at p.6.  Plaintiff has not introduced any documents or evidence to substantiate that the filing of a bankruptcy petition automatically results in the charge-off of Receivables as uncollectible: the Plaintiff's Credit Card Guidelines have not been submitted nor has any competent and admissible evidence been produced as to the Plaintiff's "customary and usual procedures" for servicing accounts.

Consequently it is impossible to determine whether Dumont's statement is accurate, further increasing the uncertainty as to true identity of the owner of the debt obligations at issue.  Such an issue may be academic however. Even if the Defendant's bankruptcy filing resulted in a transfer of the Receivables at issue from the Trust to the Transferor (Funding) as a "Defaulted Account", that transfer was subject to the Trust's right to receive all future recoveries allocable to those Receivables. See PSA Section 4.03(d) at p. 50.  But, despite these questions, one matter is clear - it is not the Plaintiff that has the ownership of the Receivables, nor the right to receive the recoveries on these Receivables.

## <u>CONCLUSION</u>

To have standing under 11 U.S.C. § 523(c)(1) to seek to hold debts nondischargeable under 11 U.S.C. § 523(a)(2) Plaintiff has the burden to establish that it is the creditor to whom the subject debt is owed and that it is asserting its own rights and not those of another entity.   The PSA makes clear that Plaintiff is not the entity to whom the debts at issue are owed and it therefore lacks standing under 11 U.S.C. § 523(c)(1) to seek relief under 11 U.S.C. § 523(a)(2) in its own name. Dismissal of the Adversary Proceeding is mandated under F.R.Bankr.P. 7012 and F.R.Civ.P. 12(b)(1).


DATE: April 13, 2009                            /s/ William Mackin
                                                Counsel for Defendant