## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY – CAMDEN

|  |  |  |
|---|---|---|
| Joseph Ruple & Julie Ruple (fka Julia Pashkovskaya), | : | Chapter 7 |
|  | : | CASE NO. 08-27447-GMB |
| Debtor. | : |  |
|  | : | Adv. Pro. No. 08-02720-GMB |
|  | : |  |
| FIA Card Services, N.A. (fka MBNA America Bank, N.A.) | : |  |
|  | : |  |
| Plaintiff, | : |  |
|  | : |  |
| v. | : |  |
|  | : |  |
| Julia Pashkovskaya, | : |  |
|  | : |  |
| Defendant. | : |  |
|  | : |  |

### PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(b)(1)

WEINSTEIN & RILEY, P.S.
By: Kenneth S. Jannette (KJ 6394)
14 Penn Plaza, Suite 1300
New York, NY 10122-0049
Tel: (800) 206-7410
Attorneys for Plaintiff
FIA Card Services, N.A

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT**……………………………………………………1

**BRIEF STATEMENT OF MATERIAL**

**FACTS**…..……………………………………………………………………2

**ARGUMENT**………………………………………………………....................5

    **I.**   **Standard For Granting a Motion To Dismiss Under Federal Rule of Civil Procedure 12(b)(1)**……………………………………………5

    **II.**  **The Constitutional Requisite of Injury for Standing to Sue Is Satisfied When a Servicer's Economic Interests Are Affected by a Bankruptcy, And in This Case Plaintiff's Servicing Fee Is Affected**…………………………………………….8

    **III.** **Servicers Have Standing By Virtue of a Contractual Obligation to Make Collections, Including Through Litigation, And Here Plaintiff Is Authorized to Collect, Including By Commencing Suit**…………………………………10

    **IV.** **Mortgage Servicers That Cannot Document a Right to Enforce a Note Cannot Prove They Are Real Parties in Interest, But Plaintiff's Right to Enforce Payment of This Unsecured Debt is Clearly Demonstrated**......................14

# TABLE OF AUTHORITIES

**Statutes and Rules**    **Page**

U.S. Const. Art. III, § 2………………………………………………………8

11 U.S.C. § 523……………………………………………………………1

Federal Rule of Civil Procedure 12……………………………………………5

Federal Rule of Civil Procedure 17……………………………………………...14

**Cases**    **Page**

Bankers Trust (Delaware) v. 236 Beltway Inv.
865 F.Supp. 1186 (E.D.Va.1994)…………………………………………………..10

Carpet Group Intern. v. Oriental Rug Importers Ass'n, Inc.,

227 F.3d 62 (3d Cir. 2000)………………………………………………………..6, 7

In re Conde-Dedonato, 391 B.R. 247 (Bankr. E.D.N.Y. 2008)…………………………….9

In re Dye, 2008 WL 2773549 (Bankr. N.D. Ga. 2008)………………………………………..9

Discover Bank v. Vaden, 489 F.3d 594 (4th Cir. 2007)…………………………....11, 12, 13, 14

In re Foreclosure Cases, 2007 WL 3232430 (N.D. Ohio 2007)…………………………….....16

Gould Elec. Inc. v. U.S., 220 F.3d 169 (3d Cir. 2000)……………………………………....6

Greer v. O'Dell, 305 F.3d 1297 (11th Cir. 2002)……………………………………………8, 9

In re Hayes, 393 B.R. 259 (Bankr. D.Mass. 2008)……………………………………….....16

In re Hwang, 396 B.R. 757 (Bankr. C.D. Cal. 2008)……………………………………………16

International Ass'n of Machinists & Aerospace Workers v. Northwest Airlines, Inc.,
673 F.2d 700 (3d Cir. 1982)…………………………………………………………………….7

In re Jacobson, 2009 WL 567188 (Bankr. W.D.Wash.)……………………………………….15

LaSalle Bank National Ass'n v. Nomura Asset Capital Corp.,
180 F.Supp.2d 465 (S.D.N.Y. 2001)…………………………………………………..12, 13, 14

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992)……………………………………………8

In re Miller, 320 B.R. 203 (Bankr. N.D. Ala. 2005)……………………………………………9

Mortensen v. First Fed. Sav. & Loan Ass'n, 540 F.2d 884 (3d Cir. 1977)………………………7

Moyer Packing Company v. U.S., 567 F.Supp.2d 737 (E.D. Pa. 2008)…………………………..7

Oneida Indian Nation v. County of Oneida, 414 U.S. 661 (1974)……………………………..6

Petruska v. Gannon University, 462 F.3d 294 (3d Cir. 2006)……………………………………6

Summers v. Earth Island Institute, 129 S.Ct. 1142 (2009)……………………………………..8

In re Tainan, 48 B.R. 250 (Bankr. E.D. Pa. 1985)………………………………………………10

Teamsters Local 331 v. Coca Cola Bottling, 2007 WL 4554240 (D.N.J. 2007)…………………6

In re Viencek, 273 B.R. 354 (Bankr. N.D.N.Y. 2002)……………………………………………9

In re Woodberry, 383 B.R. 373 (Bankr. D.S.C. 2008)……………………………………………9

## PRELIMINARY STATEMENT

On November 25, 2008, the Plaintiff filed a Complaint to have certain debt incurred by the Defendant within 90 days of her petition for relief determined to be nondischargeable.  The Defendant filed a motion to dismiss the Complaint, because the plaintiff had not yet filed a Corporate Ownership Statement.

After the Corporate Ownership Statement was filed, the Defendant changed her theory. She now alleges that the Plaintiff lacks standing.  To support her theory, the Defendant relies solely on cases where an alleged mortgage assignee attempts to foreclosure, without producing evidence of an assignment.  The Defendant fails to articulate why these holdings apply to the significantly different facts of this case.  The Defendant also fails to distinguish numerous cases wherein an entity similarly situated to the Plaintiff was held to have standing.  This case law and the evidence presented in this Brief demonstrate that the Plaintiff has standing, and that the Defendant's motion must be denied.

## PROCEDURAL HISTORY

On September 12, 2008, Julia Ruple (f/k/a Julia Pashkovsaya) ("Defendant") filed a joint petition for relief under Chapter 7 of the United States Bankruptcy Code.

On November 25, 2008 FIA Card Services, N.A. ("Plaintiff" or "FIA") filed a complaint to determine debt to be nondischargeable pursuant to 11 U.S.C. §§523(a)(2)(A) – 523(a)(2)(C) (the "Complaint").   On December 26, 2008, the Defendant filed a motion to dismiss the Complaint (the "Motion") pursuant to F.R.Bankr.P. 7007.1 and F.R.Bankr.P. 7012(b), incorporating F.R.Civ.P. 12(b).

On January 22, 2009, Plaintiff filed its Corporate Ownership Statement.  Plaintiff also filed a Certification of Kenneth S. Jannette in Opposition to Defendant's Motion to Dismiss.

A hearing on the Motion was held on February 17, 2009, at which time the court requested that the Plaintiff submit an affidavit of facts, which was filed on March 2, 2009.

A second hearing was held on March 23, 2009 and the court requested that Plaintiff file certain additional certifications.  The court also requested that the parties submit briefs in support of their legal arguments.  On April 13, 2009, Defendant submitted a brief in further support of the Motion, her second brief in this proceeding.  Also on April 13, 2009, Plaintiff filed the Supplemental Affidavit of Michelle D. Dumont, the Certification of Alessandro Rhodes and the Certification of Michelle D. Dumont.  Plaintiff now submits this brief in opposition to the Motion.

## <u>BRIEF STATEMENT OF MATERIAL FACTS</u>

The Plaintiff is now and has since May 10, 2006 been the owner of the Defendant's account numbered xxxx-xxxx-xxxx-0452 (the "Account").  <u>See</u> Certification of Michelle D. Dumont, dated as of April 6, 2009 ("Dumont Cert."), ¶ 1.

The Plaintiff is also the servicer of the receivables in the Account, including the receivables that arose between May 23, 2008, and August 4, 2008, and that are the subject of the Plaintiff's Complaint (the "Receivables"), pursuant to the Second Amended and Restated Pooling and Servicing Agreement (the "Pooling and Servicing Agreement"), dated as of October 20, 2006, among BA Credit Card Funding, LLC, the Plaintiff as Servicer, and The Bank of New York Mellon as Trustee of the BA Master Credit Card Trust II (the "Trust").  Dumont Cert., ¶ 3.

The Plaintiff has a right and duty to service and administer the Receivables and to collect payments due under the Receivables.  Dumont Cert. ¶ 7.  The Plaintiff has the right and duty to commence litigation in the event of nonpayment.  <u>Id</u>.

The Plaintiff's compensation for its servicing activities is payable only from collections and recoveries on the receivables that have been sold to the Trust (including the Receivables) and from interchange that is received by the Trust.   Dumont Cert. ¶ 8; Exhibit A1 ("Exh. A1"), Pooling and Servicing Agreement, Section 3.02, at page 40[1].   If insufficient collections, recoveries and interchange exist, the Plaintiff is not compensated for its servicing activities. Dumont Cert. ¶ 8.

The Receivables were sold by Plaintiff to Banc of America Consumer Card Services, LLC (an indirect subsidiary of the Plaintiff) (BACCS) under the Amended and Restated Receivables Contribution and Sale Agreement, dated as of October 20, 2006 between the Plaintiff and BACCS.  Dumont Cert., ¶ 5.  The Receivables were then sold by BACCS to BA Credit Card Funding, LLC (Funding) (a direct subsidiary of BACCS and an indirect subsidiary of Plaintiff) under the Receivables Purchase Agreement, dated as of October 20, 2006.  Id.  Then the Receivables were sold to The Bank of New York Mellon as Trustee (the "Trustee") of the Trust, under the Pooling and Servicing Agreement.  Id.

The Pooling and Servicing Agreement gives FIA as Servicer "full power and authority, acting alone or through any party properly designated by it… to do any and all things… which it may deem necessary or desirable" including the power to "commence enforcement proceedings" in its own name.  See Dumont Cert. ¶ 7; Exh. A1, Pooling and Servicing Agreement, Section 3.01, at page 38.

---

[1] The Dumont Cert. and the Certification of Alessandro Rhodes were originally filed separately, on April 13, 2009. Therefore, the language of these certifications each designate different documents as Exhibit "A" and Exhibit "B". To avoid confusion in this Brief, the Pooling and Servicing Agreement, originally designated as Exhibit A to the Dumont Cert., will be designated herein as Exhibit A1.  The Amended and Restated Series 2000-E Supplement to the Pooling and Servicing Agreement, originally designated as Exhibit B in the Dumont Cert., will be designated herein as Exhibit B1.  The Card Member Agreement between the Plaintiff and the Defendant, originally designated as Exhibit A to the Certification of Alessandro Rhodes will be designated herein as Exhibit A2.  The letter from Plaintiff to Defendant dated September 19, 2008, originally designated as Exhibit B to the certification of Alesandro Rhodes, will be designated herein as Exhibit B2.

The Trustee is not responsible for the manner in which FIA's duties as Servicer are performed.  <u>See</u> Dumont Cert. ¶ 9; Exh. A1, Pooling and Servicing Agreement, Section 11.01(d), at p. 77.

As a result of the Defendant's bankruptcy filing, the Account became a Defaulted Account under the Pooling and Servicing Agreement and the Receivables were automatically transferred back to Funding.  This automatic transfer to Funding was made subject to the Trust's right to all future recoveries allocable to the Receivables.  Dumont Cert., ¶ 6; Exh. A1, Pooling and Servicing Agreement, Section 4.03(d), at page 50.

Shortly after Defendant's bankruptcy filing, Plaintiff mailed to Defendant a letter informing her that, as a result of her bankruptcy filing, her Defaulted Account had been closed. Rhodes Cert. ¶ 8; Exhibit "B2" (Exh. B2), letter dated as of September 19, 2008.

The defendant listed the Plaintiff as a creditor and the Account in the sworn Schedule F filed with her Bankruptcy Petition.  <u>See</u>  Defendant's Schedule F, a copy of which is attached hereto as Exhibit "C".

On December 9, 2008, during the pendency of this proceeding, the Defendant placed a call to Plaintiff to inquire as to the balance owed on the Account.  <u>See</u>  Plaintiff's Response to Defendant's Interrogatory No. 21, a copy of which is attached hereto as Exhibit "D".   The Defendant spoke to a customer service representative employed by the Plaintiff.  <u>Id</u>.

The Plaintiff and the Defendant were the only two parties to the Card Member Agreement when the Receivables were originated.  <u>See</u>  Rhodes Cert., ¶ 4; Card Member Agreement, Exhibit "A2" (Exh. A2).  During this time, only the Plaintiff extended credit to the Defendant under the Card Member Agreement.  <u>Id</u>.

Only the Plaintiff had the right to alter the terms of the Card Member Agreement, such as setting the interest rate, finance charges and late fees on the Account.  <u>See</u>  Rhodes Cert., p. ¶ 5; Exh. A2, Card Member Agreement Section 7.14.   The Card Member Agreement states that Plaintiff "may amend this agreement by changing, adding, or deleting any term, condition, service or feature… at any time"  <u>See</u> Rhodes Cert. p. ¶ 6; Exh. A2, Card Member Agreement Section 7.14.   It further states that Plaintiff "may close your Account or suspend your credit privileges at any time without prior notice."  <u>See</u> Rhodes Cert. p. ¶ 7; Exh. A2, Card Member Agreement, Section 7.13.

## <u>ARGUMENT</u>

Where a servicer has both a pecuniary interest in making collections and an express contractual right and duty to do so, courts have held that it has standing.  As long as a servicer can document its authority to collect a debt, courts have held that it is a real party in interest and may commence litigation in its own name.  In this case, FIA is entitled to a servicing fee payable in part from the receivables it collects, therefore it has a pecuniary interest at stake.  The Pooling and Servicing Agreement gives FIA a contractual duty to collect receivables, including through litigation.  FIA has submitted clear documentary evidence of its authority to commence litigation in its own name to collect the debt at issue.  Therefore, FIA has standing and is the real party in interest in this proceeding, and the Defendant's motion must be denied.

I.   <u>Standard for Granting a Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(1)</u>

Federal Rule of Civil Procedure 12(b)(1) – 12(h)(3) states that "a party may assert the following defense[] by motion: lack of subject-matter jurisdiction.  If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."

Generally, "[f]or purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." Warth v. Seldin, 422 U.S. 490, 501; See also Petruska v. Gannon University, 462 F.3d 294 (3d Cir. 2006) ("For purposes of a motion to dismiss, we must accept as true – as did the District Court – the plaintiff's factual allegations.")

Granting a motion to dismiss under Rule 12(b)(1) requires a finding that a claim is "insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit." Oneida Indian Nation v. County of Oneida, 414 U.S. 661, 776 (1974).

Dismissal is warranted only if the claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or ... is wholly insubstantial and frivolous." Gould Elec., Inc. v. U.S., 220 F.3d 169, 178 (3d Cir. 2000); Teamsters Local 331 v. Coca Cola Bottling, 2007 WL 4554240, at *2 (D.N.J. 2007). "A claim is insubstantial only if its unsoundness so clearly results from the previous decisions of this court as to foreclose the subject and leave no room for the inference that the questions sought to be raised can be the subject of controversy." Id.

The Third Circuit has recognized two avenues for an attack on standing under 12(b)(1). In the first, subject matter jurisdiction is attacked "in fact," meaning the defendant "dispute[s] the existence of certain jurisdictional facts alleged by the plaintiff[]. When a defendant attacks subject matter jurisdiction 'in fact'… the Court is free to weigh the evidence and satisfy itself whether it has power to hear the case." Carpet Group Intern. v. Oriental Rug Importers Ass'n, Inc., 227 F.3d 62 (3d Cir. 2000).

When "a motion to dismiss is supported by a sworn statement of facts" it is properly "construed as a factual, rather than a facial attack on the court's subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1)."  International Ass'n of Machinists & Aerospace Workers v. Northwest Airlines, Inc., 673 F.2d 700, 711 (3d Cir. 1982); See also Moyer Packing Company v. U.S., 567 F.Supp.2d 737, 748-49 (E.D. Pa. 2008) (Court construed motion to dismiss as factual challenge because defendant "attached exhibits in support of its motion, which consist[ed] of declarations of several…officials, and [b]ecause these exhibits, not referenced in the Complaint, raise[d] issues of fact.")

 "In deciding a factual challenge under Rule 12(b)(6) the court must demand less in the way of jurisdictional proof than would be appropriate at a trial stage," but may freely evaluate jurisdictional facts.  Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d at 892 (3d Cir. 1977); Carpet Group Intern., 227 F.3d 62, 69 ("The existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims."); Moyer, 567 F.Supp.2d 737, 749.

The second type of 12(b)(1) motion "attacks the complaint on its face and, for such a challenge, the court must consider only the complaint's allegations and do so in the light most favorable to the plaintiff."  Mortensen, 540 F.2d 884, 891; Moyer, 567 F.Supp.2d 737, 748.

In this case, the Defendant has not submitted a sworn statement of facts with her motion. Rather, Defendant has solely made legal arguments.  These arguments assert that the complaint is facially insufficient because FIA, as a servicer, cannot have standing as a matter of law.  They also seek to construe the legal meaning and import of language in Pooling and Servicing Agreement.  However, absolutely no authenticated factual evidence has been submitted by defendant, by sworn affidavit or otherwise, as required in a factual attack on standing under

12(b)(1).  Therefore, the court must construe this as facial challenge and accept as true all material allegations of the complaint in the light most favorable to the Plaintiff.

> **II.      The Constitutional Requisite of Injury for Standing to Sue Is Satisfied When a Servicer's Economic Interests Are Affected by a Bankruptcy, And in This Case Plaintiff's Servicing Fee Is Affected**

The United States Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies".  U.S. Const. Art. III, § 2.  Courts have interpreted this to mean that a federal court's subject matter jurisdiction "can be invoked only when the plaintiff himself has suffered some threatened or actual injury."   Warth v. Seldin, 422 U.S. 490, 498 (1975) (internal quotations omitted).

In other words, "the standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal court jurisdiction and to justify exercise of the court's remedial powers on his behalf." Id. at 498-99. See also  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992); Summers v. Earth Island Institute, 129 S.Ct. 1142, 1146-48 (2009).

In the context of consumer bankruptcies, courts have held that a debt servicer has a sufficient stake in a case to warrant standing where its economic interest is "directly affected" by a debtor's bankruptcy.  Greer v. O'Dell, 305 F.3d 1297, 1303 (11th Cir. 2002).  This is true where the servicer is "entitled to a fee with respect to amounts it collected."  Id.

In Greer, a servicer collected receivables due on credit card accounts held by individuals who had filed for bankruptcy, on behalf of a bank.  Id. at 1299.  While the debts at issue were ultimately purchased by the servicer, at the time it filed its proof of claim the transfer had not been consummated.  Id.  at 1299-1300.  The debtors objected.  Id. at 1300-02.  The debtors

alleged that the bank, not the servicer, had standing to pursue the claim, and the court below disallowed it. Id.

On appeal, the Eleventh Circuit reversed, and held that whether the transfer of ownership had occurred when the claim was filed was immaterial. Id. at 1302. The servicer had suffered injury by virtue of diminution of its servicing fee. Id at 1302-03. The court held that "[t]he Bankruptcy Code… [has] liberal standing provisions, designed to allow a party to appear as long as it has a direct stake in the litigation under the particular circumstances." Id. at 1302.

The United States Bankruptcy Court for the District of South Carolina reached a similar result in In re Woodberry, 383 B.R. 373, 380 (Bankr. D.S.C. 2008). In Woodberry, the debtor gave a promissory note secured by a mortgage to SouthStar Funding, LLC, which was later transferred to a securitized trust. Id. at 375.

The debtor filed for bankruptcy relief, and America's Servicing Co. ("ASC"), pursuant to its duties under a servicing agreement, filed a motion for stay relief. Id. The debtor objected on the grounds that "ASC failed to provide adequate documentation with its Motion establishing that ASC'" had standing to bring the motion. Id.

However, the court disagreed, and, in granting ASC's motion, held that a "*servicer has standing by virtue of its pecuniary interest in collecting payments.*" Id. at 379 (emphasis added). See also In re Viencek, 273 B.R. 354, 359 (Bankr. N.D.N.Y. 2002) (Servicer had standing "because of its pecuniary interest in the mortgages it services," for which it was paid a fee.); In re Conde-Dedonato, 391 B.R. 247, 250 (Bankr. E.D.N.Y. 2008) (servicer had standing "by virtue of its servicing activities for which it receives compensation."); In re Dye, 2008 WL 2773549 at *1 (Bankr. N.D. Ga. 2008); In re Miller, 320 B.R. 203 (Bankr. N.D. Ala. 2005);

Bankers Trust (Delaware) v. 236 Beltway Inv., 865 F.Supp. 1186, 1191 (E.D.Va.1994);  In re

Tainan, 48 B.R. 250 (Bankr. E.D. Pa.  1985).

In this case, the payment of FIA's servicing fee depends on the receipt of collections and

recoveries on the receivables that have been sold to the Trust (including the Receivables). To the

extent that these funds are not collected or recovered from the Defendant and other obligors on

the credit-card accounts that have been designated for the Trust, FIA as Servicer may be injured.

The Defendant contends that the Plaintiff cannot have standing because it does not have

"ownership" of the Receivables.  See Def.'s Brief In Support of Dismissal, at p. 10 (Apr. 13,

2009).  However, the case law on this issue is clear: to have standing, all that is that is required is

that the Plaintiff's economic interest be directly affected by a bankruptcy.  This standard is

satisfied here.  Plaintiff, by virtue of its direct economic stake in the defendant's bankruptcy, has

standing in this adversary proceeding.[2]

### III.    Servicers Have Standing By Virtue of a Contractual Obligation to Make Collections, Including Through Litigation, And Here FIA Is Authorized to Collect, Including By Commencing Suit

Courts have held that where a servicer has a contractual obligation to perform collections,

including though litigation, it has standing to sue in its own name.  Greer, 305 F.3d 1297, 1303.

In Greer, Max Flow (a servicer) entered into contracts with a bank, requiring it to file

claims in bankruptcy court.  Id.  Pursuant to the contracts, it "was obligated as a servicer to file a

proof of claim… to retain counsel to defend it, to collect payments, and to perform

administrative services with respect to the claim."  Id.  The court found it significant that the

---

[2]  The Plaintiff also has an indirect economic stake. Funding, which is an indirect subsidiary of the Plaintiff, owns a number of beneficial interests in the Trust – including the sizeable Transferor Interest. From time to time, the Board of Directors of Funding declares and pays a dividend out of its surplus (including the net profits of Funding that are derived from its beneficial interests in the Trust) to BACCS, BACCS makes distributions to its direct parents on account of their equity interests in BACCS, and each of these entities makes distributions to the Plaintiff on account of its equity interests in them.

servicer "was obligated to pay the fees of the outside counsel [it was] required to retain." Id.

The court found that the "purpose behind the [contracts] was to provide a mechanism for

legitimate debt collection activities in bankruptcy." Id.

Those contractual rights and duties underpinned the court's holding that "[e]ven

assuming… that Max Flow was merely the servicer… it was a party in interest entitled to defend

the claim… and to take all required action through counsel." Id. See also Woodbury, 383 B.R.

373, 379 ("[L]oan servicer, with a contractual duty to collect payments… has standing."); In re

Viencek, 273 B.R. 354, 357-38 (Bankr. N.D.N.Y. 2002) (loan servicers have standing by virtue

of "[c]ontracts by which servicer is authorized to litigate claims" that "illustrate[] an

understanding of modern day financing.")

The Fourth Circuit, in Discover Bank v. Vaden, 489 F.3d 594 (4th Cir. 2007), also

analyzed a servicer's contractual rights and duties in order to determine which of two entities had

standing to collect receivables.  While the court ultimately held that a bank, not a servicer, had

standing to sue, it stated "we emphasize the heavily fact-dependent nature of our analysis and its

consequent parameters," and set forth a list determinative facts. Id. at 603 n. 4.

Vaden was a complex case involving questions of preemption under the Federal Deposit

Insurance Act. Id. at 598-600.  The case turned, in part, on whether a bank or a debt servicer

was the real party in interest. Id. at 600-03.  If the bank was the real party in interest, the case

could proceed in federal court. Id.  If not, the case would be remanded. Id.

In making its determination, the court found that "[t]he Cardmember agreements…

[were] of particular significance," because these agreements conclusively demonstrate that

Discover Bank was the entity that extended [the debtor] credit and set the interest and fees." Id.

at 602.  These "agreements allow[ed] Discover Bank to levy periodic finance charges and late fees, as well as to change the rate of finance charge with thirty days' notice."  Id.

The court also found it significant that "Discover Bank and Vaden… were the only two parties to the original Cardmember agreement."  Id.

Looking to the servicing agreement between the bank and the servicer, the court noted that the servicer "must perform all marketing and collection services under instructions from Discover Bank."  Id.  The court also noted that "[n]othing on the statements… mailed to [the debtor] identified [the servicer] as the lender."  Id.

Finally, the court noted that the servicing agreement "establishe[d] a clear division of authority between [the servicer] and Discover Bank, designating Discover Bank as the party in charge of setting the terms and conditions of lending money through its credit cards. [A]lthough [the servicer] could evaluate consumer credit applications, it could only do so under guidelines set forth by Discover Bank."  Id.

Other courts have relied on analysis of contractual rights duties to determine standing.  LaSalle Bank National Ass'n v. Nomura Asset Capital Corp., 180 F.Supp.2d 465 (S.D.N.Y. 2001).  Where these duties are significantly limited and a servicer can take actions only at the direction of a trustee, courts have held that it did not have standing.  Id.

In LaSalle, LaSalle Bank National Association ("LaSalle"), a trustee of a securitized pool of commercial mortgages, filed suit against a certain mortgagee for default and for breach of certain representations regarding the collateral.  Id. at 468.  The defendant moved to dismiss.  Id.  The defendant alleged that the court lacked subject matter jurisdiction because Lend Lease Asset Management, L.P. ("Lend Lease"), the servicer, was not the proper party to bring the suit, pursuant its duties as enumerated in the parties' pooling and servicing agreement.  Id.  at 470.

Pursuant to the pooling and servicing agreement, Lend Lease was "strictly limited in its powers." Id. For example, the court found that "[t]he terms of the PSA demonstrate… that it is only LaSalle, and not Lend Lease, who has the power and obligation to sue. [T]he whole structure of the PSA demonstrates that, while Lend Lease has the power and duty to attempt to maximize recovery from defaulted loans or investments in many ways, it is LaSalle alone who may 'take such action as may be appropriate to enforce such payment performance, *including the institution and prosecution of appropriate proceedings*.'" Id. at 471. Furthermore, "to obtain judgment against a borrower, Lend Lease may prepare any court pleadings, but it is LaSalle alone who shall execute such pleadings" Id.

Although "the PSA grant[ed] Lend Lease 'power and authority' to take certain actions with regard to servicing loans… Lend Lease must notify LaSalle upon taking action[] and must provide LaSalle with written notice and explanation of events that would have a 'material adverse effect of any of the mortgages.'" Id. at 470.

Each of the factors supporting standing in Discover Bank in Vaden are in favor of the Plaintiff in this case. For example, The Pooling and Servicing Agreement in this case gives FIA "full power and authority, acting alone or through any party properly designated by it… to do any and all things… which it may deem necessary or desirable" including the power to "commence enforcement proceedings" in its own name.

When the Receivables were originated, the Plaintiff and the Defendant were the only two parties to the Card Member Agreement. Only the Plaintiff, and no other entity, had the right during this time to alter the terms of the Card Member Agreement, such as setting the interest rate, finance charges and late fees on the Account. For example, the Card Member Agreement

states that Plaintiff "may amend this agreement by changing, adding, or deleting any term, condition, service or feature… at any time."

The card member agreement also states that Plaintiff "may close your Account or suspend your credit privileges at any time without prior notice."  Pursuant to this authority,  the Plaintiff informed the Defendant by letter dated September 19, 2008 that, as a result of her bankruptcy filing, her Account had been closed.

Unlike the servicers in Vaden and Lasalle, the Plaintiff does not perform its servicing duties at the direction or under the control of any other entity.  The Trustee is not responsible for the manner in which FIA's duties as Servicer were performed.

The Plaintiff in this case had both a contractual right and a duty to collect the Receivables due on the Defendant's Account that are the subject of this proceeding.  It did so, in its own discretion, under the express terms of the Card Member Agreement between the Plaintiff and the Defendant and the Pooling and Servicing Agreement.  By virtue of these contractual rights and duties, the Plaintiff has standing in this adversary proceeding. [3]

### IV. **Mortgage Servicers That Do Not Document a Right to Enforce a Note Cannot Prove They Are Real Parties in Interest, But Plaintiff's Right to Enforce Payment of This Unsecured Debt is Clearly Demonstrated**

Federal Rule of Civil Procedure 17 states that "[a]n action must be prosecuted in the name of the real party in interest."  Comments to the 1996 Amendment to Federal Rule of Civil Procedure 17 state that the purpose of the rule is "to protect the defendant against a subsequent

---

[3] Granting the Plaintiff the right in the Pooling and Servicing Agreement to commence enforcement proceedings relating to delinquent receivables effects, in substance, an assignment of those delinquent receivables for collection. See, e.g., III Farnsworth on Contracts § 11.3 at 69 (2004 and 2009 Supp.) ("No words of art are required [to effect an assignment]; the assignor need not even use the word assign."); see also Lerner v. Joyce International, Inc., 10 F.3d 106, 112 (3d Cir. 1993) (no terms of art generally are required to make a valid assignment). The U.S. Supreme Court recently affirmed the longstanding rule that an assignee of a legal claim for money owed has standing to pursue that claim in federal court. Sprint Communications Co., L.P. v. APCC Services, Inc., 128 S.Ct. 2531 (2008).

action by the party actually entitled to recover, and to insure generally that the judgment will have its proper effect as *res judicata*."    F.R.Civ.P. 17, cmt. 1 (1996).

Those cases where courts have held that servicers are not real parties in interest "reflect a backlash against the subprime mortgage industry."    Barkley Clark and Barbara Clark, Clark's Bank Dep. & Paymt. Monthly,  p. 1 (February, 2009).  Where,  "[i]n the process of securitizing loans, the market players flipped loans multiple times without documenting transactions along the way."  Id.

These decisions are replete with frustration at the fast and loose practices of the mortgage industry and are specifically addressed only to "foreclosure proceedings".  In re Jacobson, 2009 WL 567188, *1 (Bankr. W.D. Wash. 2009).

In Jacobson, joint debtors filed for bankruptcy relief, and an entity called UBS AG filed a motion "to enforce a deed of trust on the Debtors' residence."  Id.  The court confronted a dearth of evidence as to UBS AG's authority.  Id. at *2.  Examining the record, it found that "[n]o evidence is provided, nor is any assertion even made, regarding UBS AG's authority to act for the holder of the note."  Id.

The court recited a litany of ways in which the evidence before it "neither shows who presently holds Debtors' note nor [UBS AG's] authority."  The servicer submitted only a vague declaration, and the court noted with disapproval that "no business records are actually proffered".  Id. at *7.

Furthermore, the court noted evidentiary defects and "obvious errors" in the declaration's "syntactical fog," finding that "nothing meaningful regarding the declarant's qualifications to authenticate business records, or the reliability of those records" was submitted.  Id. at *8.  The

court concluded that nothing "in the record establish[ed] [UBS AG's] authority to enforce the…

note, for whomever holds it; and… to foreclose." Id.

Because "[t]he servicer failed to "to produce and authenticate that authority" and UBS

AG "neither assert[ed] a beneficial interest in the note, nor that it could enforce the note in its

own right" Id. at *4 UBS AG could not proceed with the litigation.  See also In re Sheridan, 2009

WL 631355, *1-4 (Bankr. D.Idaho 2009) ( "Serial assignments of the mortgagee's interest(s)"

without proper documentation made it impossible to establish it was the real party in interest); In

re Hayes, 393 B.R. 259, 268-70 (Bankr. D.Mass. 2008) ("[C]onfusion and lack of knowledge, or

perhaps sloppiness" "confounded identity" of holder of mortgage note, where an "incomplete

[pooling and servicing agreement], and… back-dated, unrecorded assignments" were submitted

and "[d]ebtor complained that she could not verify that twenty-two payments were in arrears.");

In re Kang Jin Hwang,  396 B.R. 757, 766 (Bankr. C.D. Cal. 2008) (Servicer submitted

testimony of officer "that she does not know who owns the note at the present time, and "fail[ed]

to offer in evidence any servicing agreement with the… owner".);  In re Foreclosure Cases, 2007

WL 3232430 (N.D. Ohio 2007) (Assignments of mortgage notes failed to show Plaintiffs had

any rights or interests in mortgages at issue.  Court would "carefully scrutinize all filings and

pleadings in foreclosure actions" because of the "unique nature of real property" which is

"subject to the recording requirements.")[4]

---

[4] There is no doubt that the decision in In re Foreclosure Cases, 2007 WL 3232430, was an attempt to stem a
ballooning number of subprime mortgage foreclosures and the resultant blight on residential communities.  The
court decried "financial institutions or successors/assignees [that] rush to foreclose, obtain a default judgment and
then sit on the deed, avoiding responsibility for maintaining the property while reaping the financial benefits of
interest running on a judgment.  The financial institutions know the law charges the one with title (still the
homeowner) with maintaining the property." Id. at *3, n. 3.  See generally Erik Eckholm, Foreclosures Force
Suburbs to Fight Blight, 156 N.Y. Times A14 (March 23, 2007).  As such, this case is not on point here and
Defendant's near-total reliance on it is misplaced.

On the other hand, in cases where a loan servicer can document that it has a right and duty to enforce payment, including through litigation, courts have held that it is a real party in interest.  <u>Woodbury</u>, 383 B.R. 373, 379.

For example, in Woodbury, ASC, a servicer, submitted credible testimony regarding ownership of a note.  <u>Id</u>. at 376.  ASC also submitted a "Securitization Subservicing Agreement" governing its rights and duties, which "provide[d] that [ASC], among other things, will collect payments due under the terms of the notes and mortgages that are the subject of the agreement and will foreclose on properties in the event of defaults in payment."  <u>Id</u>.

The court noted that under Rule 17 the "real party in interest is the one who… is the party entitled to bring suit," and observed that "other jurisdictions tend to favor the view that a loan servicer is a… real party in interest." <u>Id</u>. at 379. (internal quotations omitted).  The court held that ASC was the real party in interest.  <u>Id</u>.

Considering the real party in interest rule in <u>Greer</u>, the Eleventh Circuit held that "[t]he Bankruptcy Code and Rule 17 of the Federal Rules of Procedure each have liberal… provisions," under which "[t]he real party interest principle is a means to identify the person who possesses the rights sought to be enforced." <u>Greer</u>,  305 F.3d 1297, 1303.

The court looked to the "Interim Agreement", one of two agreements between the servicer and the bank, under which the servicer "was *obligated* as a servicer to file a…claim" and "to defend [the claim], to collect payments, and to perform administrative services with respect to the claim." <u>Id</u>. (emphasis in original).

Because the relevant agreements clearly evidenced the servicer's duty to litigate, the court held that the "servicer is a party in interest in proceedings involving loans which it services." <u>Id</u>. at 1302.  The court in <u>Greer</u> also found it disingenuous that the debtors had listed

the debt at issue on their Schedule F, but that "[d]espite Debtors'… sworn schedules, they filed

an objection." Id. at 1299. See also Tainan 48 B.R. 250, 252 (servicer may be real party in

interest where clearly authorized to make "final and binding decisions" and "be in… command of

the action as to be legally entitled to give a complete acquittal or discharge to the other party

upon performance.")

In this case, the Pooling and Servicing Agreement gives FIA as Servicer the right to do

"any and all things" to collect amounts owed, including the right "to commence enforcement

proceedings." Further, the card member agreement between the Plaintiff and the Defendant

authorized the Plaintiff set all pertinent terms governing the account, and take action up to and

including closing it altogether. This is clearly the binding authority contemplated by the real

party in interest rule.

The Defendant attempts to controvert this authority with a conclusory argument: the

language authorizing Plaintiff to commence enforcement proceedings does not give plaintiff the

right to sue because she says it does not. See Def.'s Brief In Support of Dismissal, at p. 19

(April 13, 2009). Defendant has submitted no evidence, in the form of a legal expert's opinion

or in any form whatsoever, explaining this absurd interpretation of the language. There is

nothing in the record to support a conclusion that this language imports anything other than its

plain meaning.

Furthermore, the concern, discussed above, with opaque practices in the mortgage

industry are not applicable here. In cases such as Hayes, for example, failures to comply with

assignment and recordation formalities left debtors confused as to whom to look to for

information about their home loan balances and arrearages.

The Defendant cannot credibly complain of any confusion with respect to what entity is has authority to make decisions and provide accurate information regarding this debt. The Defendant placed a telephone call to the Plaintiff to inquire as to her balance on December 9, 2008, during the pendency of this action. Any alleged confusion is disingenuous at best, where, as the debtors in <u>Greer</u>, the Defendant listed the Plaintiff and indicated the approximate amount owed to the Plaintiff in her sworn Schedule F.

Further, unlike the undocumented mortgage note assignees in the foreclosure cases, Plaintiff has submitted the Pooling and Servicing Agreement, the Card Member agreement, and other clear documentary evidence of its authority to commence litigation in its own name to collect the unsecured debt at issue.

## <u>CONCLUSION</u>

The facts of this case, analyzed in light of the relevant case law, do not support granting Defendant's motion to dismiss. Defendant's argument that Plaintiff has no standing because it is "merely" the Servicer is without merit. Recent case law is replete with findings that servicers have standing, by virtue of a pecuniary interest in a servicing fee, and contractual duties to collect through litigation. Plaintiff has both.

Further, Defendant's reliance on mortgage foreclosure cases is misplaced. Plaintiff is not an undocumented mortgage assignee. Rather, its contractual relationships and rights regarding this unsecured debt are clearly documented. Therefore, Defendant's motion must be denied.